**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **NANCY KARPEN,** | |
| **Plaintiff,** | |
| **v.** | **Case No.  21 C 5504** |
| **DENIS R. McDONOUGH, Secretary of the Department of Veterans Affairs,** | **Judge Harry D. Leinenweber** |
| **Defendant.** | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Nancy Karpen ("Karpen") has worked as a nurse employed at the Jesse Brown VA Medical Center ("Jesse Brown VA") since December 2009. Between December 2009 and February 2021, Karpen unsuccessfully applied for numerous positions. Based on her unsuccessful applications, Karpen filed a four-count Complaint alleging discrimination on the basis of race and age, as well as retaliation. But Karpen has failed to adduce evidence of race and age discrimination or retaliation that would be sufficient to support a reasonable jury verdict in her favor, so the Court GRANTS the Defendant's Motion for Summary Judgment (Dkt. No. 35) as to each of her claims.

### I.    BACKGROUND

#### A.    Karpen's Employment at the Jesse Brown VA

Except where noted, the following facts are undisputed. Karpen, a white woman currently in her mid-60s, is a VA employee who has worked as a nurse at the Jesse Brown

VA since late 2009. For more than ten years between 2009 and early 2021, Karpen worked in the outpatient specialty clinic. Karpen's responsibilities included intake and patient care. Since early 2021, Karpen has worked in the neurology clinic.

During her time in the outpatient specialty clinic, Karpen's direct or first-line supervisor was Jacqueline Thebaud ("Thebaud"), the nurse manager of that clinic. Thebaud was born in Haiti and considers herself Black or West Indian. She is currently in her late 70s. Karpen's second-line supervisor (*i.e.,* Thebaud's direct supervisor) was Dana Beatty ("Beatty"), a Black woman currently in her late 50s who was an associate chief nurse. Karpen's third-line supervisor (*i.e.,* Beatty's direct supervisor) was Mary Toles ("Toles"), a Black woman currently in her mid-60s (and slightly older than Karpen) who served as the deputy associate director for patient care services.

### B.    Karpen's Prior EEOs

About four years after joining the outpatient specialty clinic, Karpen began to have conflict with a Black woman and fellow staff nurse in the clinic named Sheneill Fitzpatrick ("Fitzpatrick"). In the spring of 2014, Karpen contacted an equal employment opportunity (or "EEO") counselor, alleging that Fitzpatrick and two other nurses had yelled at her during a meeting and that Thebaud had not stopped them. Karpen also alleged that Fitzpatrick accused her of being racist after she (Karpen) used the words "you people" or "you guys" to refer to Fitzpatrick and others. (Dkt. No. 36, LR 56.1(a)(2) STATEMENT ("Def. SOF") ¶ 7).

A few months after contacting the EEO counselor, in the early summer of 2014, Karpen entered into a settlement agreement with the VA to resolve these allegations.

Karpen withdrew her informal complaint in exchange for being detailed to the neurology clinic for 90 days. Later that summer, however, Karpen contacted an EEO counselor again, this time alleging that Fitzpatrick had called her a "bigot" and a "liar" during a staff meeting. (*Id.* ¶ 9). Karpen subsequently submitted a formal EEO complaint based on these allegations. The resultant administrative decision found that Karpen failed to prove race discrimination or retaliation. The administrative decision informed Karpen that she could file suit in federal district court within 90 days, but she opted not to do so.

### C.    Karpen Proficiency Reports

Fitzpatrick left the outpatient specialty clinic about eight years ago in 2015, and Karpen has not spoken to her since about seven years ago in 2016. Nevertheless, after Fitzpatrick left the unit, Karpen began to have disagreements with her direct supervisor Thebaud about her performance ratings, which Karpen believed negatively impacted her chances for promotion.

Nurses at the Jesse Brown VA are assigned a "grade" or category of I to V based on their education, experience, and other factors. Staff nurses like Karpen then have their performance evaluated on an annual basis. As part of this process, the nurse manager prepares what is a called a "proficiency report," which evaluates the staff nurse's performance across various criteria, all of which are described in the VA Handbook. (*Id.* ¶ 13, Def. Ex. ("DX") 13). The available ratings from highest to lowest are "outstanding," "high satisfactory," "satisfactory," "low satisfactory," and "unsatisfactory." (*Id.*).

Karpen's assigned grade is Nurse II, with the next grade up being Nurse III. Early on in her tenure with the outpatient specialty clinic, Karpen received a performance rating

of "high satisfactory," which means that the nurse has met the applicable criteria and usually exceeds expectations. (*Id.* ¶ 15). Between 2015 and 2020, Karpen received ratings of "satisfactory," which means that the nurse has met the applicable criteria and, at times, exceeds expectations. As time went on, Thebaud assessed that Karpen was spending too much time on schoolwork rather than her job (while she was working for the VA, Karpen pursued and obtained a master's degree in nursing, as well as a family nurse-practitioner certificate, which she earned in 2013 and 2017, respectively). In Thebaud's view, Karpen no longer consistently went "above and beyond," which she would have needed to do to maintain her "high satisfactory" performance rating. (*Id.* ¶ 22).

Karpen often provided Thebaud with extensive written feedback regarding her own performance ratings. In late 2016, for example, after Thebaud had already completed her proficiency report, Karpen submitted more than 60 pages of comments that expressed her disagreement with the "satisfactory" performance rating Thebaud had assigned her. The record is unclear on whether Thebaud, Karpen, or some other individual provided Karpen's feedback to the relevant administrator so that the documents could be considered as part of Karpen's application for promotion, discussed further below. Regardless, Karpen's written feedback was submitted. (*Id.*, DX 2at 81:5-84:1, 101:20-102:6, 123:7-126:15; Dkt. No. 37, Pl. Reply to Def. Statement of Facts ("Pl. SOF"), Pl. Ex. ("PX") 8-9)).

### D. Karpen's Non-Promotions

To be promoted from Nurse II to Nurse III at the Jesse Brown VA, a staff nurse like Karpen must meet the dimensions and criteria discussed above at the Nurse III grade for the entire preceding 12-month period. In other words, the staff nurse must already be performing at the grade they are seeking to be promoted to. A staff nurse must also make an impact beyond their own clinic or unit. A staff nurse may do this in a variety of ways, including by taking on leadership roles, finding ways to increase patient satisfaction, and sharing successful practices with other nurses.

To determine whether a staff nurse has met the criteria for promotion, the nurse manager submits the nurse's proficiency report to the Nurse Professional Standards Board or "NPSB," a group of about 25 nurses at the Jesse Brown VA that sits in panels of three or five to consider promotions. This NPSB process takes place automatically every year, and a "satisfactory" performance rating does not preclude a staff nurse from being promoted to Nurse III (in disputing this fact, Karpen concedes that at least one promoted individual received a "satisfactory" rating). (Pl. SOF ¶ 27.) One member of the NPSB panel reads the proficiency out loud, and the rest of the panel then participates in a discussion and decides whether to recommend promotion by a majority vote. Once a recommendation is made, it goes to the medical center director or their designee for approval. There is no typical time frame in which nurses are promoted from Nurse II to Nurse III at the Jesse Brown VA, and most of the nurses in the outpatient specialty clinic are at the Nurse II grade. For instance, Thebaud, Karpen's supervisor, remained a Nurse II for 25 years.

Between 2015 and 2020, the NPSB determined that Karpen did not meet some or all of the relevant criteria and thus did not recommend her for promotion, including in 2015, despite her most-recent "high satisfactory" performance rating. These recommendations were approved by the medical center director, and Karpen was not promoted. Overall, the NPSB assessed that while Karpen was adequately performing her job, she was not looking to make a broader impact outside her clinic, such as at the facility level or beyond.

In 2016, Karpen requested reconsideration, first from the NPSB and then from the VA central office in Washington, D.C. Karpen submitted more than 100 pages of additional documents to the NPSB, but her request for reconsideration was denied. The VA central office agreed with the NPSB that Karpen had not met the relevant criteria or demonstrated "programmatic leadership" at the Jesse Brown VA. (Def. SOF ¶ 33, DX29).

### E.    Karpen's Non-Selections

Between 2015 and 2020, Karpen applied but was not selected for various positions at the Jesse Brown VA. During this same time, she also applied for 19 positions outside of the Jesse Brown facility. Karpen was not selected for any of these roles either. Nursing vacancies at Jesse Brown are always announced internally and made available to current employees in accordance with the union contract. The "selecting official" for a specific vacancy — typically the nurse manager of the hiring unit — may also decide to announce the position outside the VA and make it available to external candidates. (*Id.* ¶ 36). Once a vacancy is announced, the selecting official decides how to evaluate applicants, whether by reviewing resumes, interviewing candidates, or some combination. The selecting

official also decides who should be hired for the role. Once a selection is made, deputy associate director Toles's practice during the relevant time period was to review the selection to ensure that the selectee had the requisite qualifications for the role and that the selection process complied with the union contract.

## 1. Vacancy No. 2015-12

In 2015, Karpen applied for Vacancy No. 2015-12, a nursing position in utilization management, which relates to the efficiency and necessity of health care services provided. The selecting official for the position was Deborah Barker ("Barker"), a white woman currently in her early 70s who was the chief of performance improvement and quality, safety, and value at the Jesse Brown VA (a position parallel to the position held by Toles). Karpen was interviewed along with other applicants, and the interviews were scored by the interview panel. Karpen received the lowest score of all those interviewed, while the selectee, Yvonne Lawrence-Hooper, a Black woman in her early 50s, received the highest score. Lawrence-Hooper had recent experience with utilization management and a background with inpatient care (which is the focus of utilization management). But after Hooper was selected, she left the Jesse Brown VA to go to another facility, and the position was thus reposted. Donald Howard, a Black man in his late 50s, was subsequently selected for the role. Howard was selected in part because he had a background in mental health, and the role required utilization management reviews of the inpatient mental health unit to determine whether patients should remain or be transferred elsewhere.

### 2. *Vacancy No. 2016-32*

In mid-2016, Karpen applied for Vacancy No. 2016-32, a patient safety nurse manager position responsible for various patient safety initiatives at the facility. Barker was the selecting official again. All candidates including Karpen were interviewed and scored by the same panel. Karpen received the lowest score of all those interviewed, while the selectee, Megan McLaughlin, a white woman in her late 20s, received the highest score. McLaughlin had already been acting in the role for about a year and had also worked in a patient safety position for about two or three years before then. Barker had thus worked with her previously and assessed that she had a strong work ethic, as well as the necessary leadership and other skills required for the job.

### 3. *Vacancy No. 2916-79*

Later in 2016, Karpen applied for Vacancy No. 2016-79, a clinical nurse leader position responsible for working with various provider types and coordinating care. The selecting official was Norma Dorsey ("Dorsey"), a Black woman in her late 50s who was the nurse manager for the medical surgical unit at the Jesse Brown VA. Dorsey filled the position by reviewing the resumes of Karpen and the one other applicant, Opokua Osei-Yeboah, an African woman in her late 30s. Dorsey selected Osei-Yeboah because she had previously worked for Dorsey in the same position for about two years and received an outstanding performance rating. She also had an excellent relationship with physicians and nursing staff.

- 8 -

### 4. Vacancy No. 2917-70

In 2017, Karpen applied for Vacancy No. 2017-70, a patient safety nurse specialist position responsible for tracking and analyzing various patient safety metrics. Barker was the selecting official. Interviews were not conducted for the position, and the selectee was Claire Gangware, a white woman in her late 50s. Gangware received the highest score from the resume review used to fill the position, while Karpen received the lowest score. Barker selected Gangware because she worked as a clinical nurse specialist on a very active inpatient medical floor, had a broad spectrum of clinical knowledge, and was highly regarded nationally within the VA.

### 5. Vacancy No. 2018-23

Karpen applied for several positions in 2018. She first applied for Vacancy No. 2018-23, an ethics consultation coordinator position responsible for addressing the complex ethical issues that arise in patient care. The selecting official was Dr. Robert Buckley, a white man in his late 50s, who was the chief of staff at the Jesse Brown VA. Karpen was not interviewed for this position because only the top two scoring candidates were interviewed, based on a review of their resumes. The selectee for the position was Thomas Sifner, a white man in his early 60s. Dr. Buckley selected Sifner because he had extensive experience and service on the integrated ethics committee at the Jesse Brown VA, as well as on the clinical ethics consultation service. In Dr. Buckley's view, Sifner was clearly the most qualified applicant for the position.

### 6. Vacancy No. 2018-26

Karpen next applied for Vacancy No. 2018-26, another nursing position in utilization management. Barker was the selecting official. Karpen was not interviewed for this position because only the top scoring candidates were interviewed, based on a review of their resumes. The selectees included Janice Pullins-Brown, a Black woman in her early 60s, and Crystal Priest, a Black woman in her late 30s. Candy Hambrick, a Black woman in her mid-40s, was selected to work the evening shift. Barker made the selections because both Pullins-Brown and Priest had been working as utilization management nurses outside of the VA for more than five years. Barker selected Hambrick because she had a broad scope of clinical experience, including as a nurse in the intensive care unit.

### 7. Vacancy No.2018-36

Karpen next applied for Vacancy No. 2018-36, a nurse practitioner position that would focus on providing health care to patients in their homes. The selecting official for the position was Phyllis Evans, a Black woman in her mid-60s, who was the home care manager at the Jesse Brown VA. Karpen was interviewed along with other applicants, including the selectee, Jeanette Atanga, a Black woman around 40 years old. Atanga's interview score was significantly higher than Karpen's. In addition to meeting the required and preferred qualifications for the position, Evans deemed Atanga to have strong patient assessment and communication skills. Karpen did not meet the preferred qualifications for the position because she did not have a certification in adult gerontology (home care

- 10 -

often focuses on older adults), or experience as a community health nurse or with home-based primary care.

### 8. *Vacancy Nos. 2018-37 and 2019-34*

Karpen next applied for Vacancy No. 2018-37, a nurse practitioner position at one of the Jesse Brown VA's community-based outpatient clinics. The selecting official for the position was Toni Majied, a Black woman around 50 years old, who was the nurse manager of the clinic. All candidates were interviewed, including Karpen, but the position was closed when a "gap provider" who had been temporarily filling the position came back from maternity leave. The position was subsequently reposted as Vacancy No. 2019-34 when the gap provider was needed at a different clinic. Candidates were interviewed again, including Karpen, and Denise Castle, a Black woman in her mid-60s, was selected. Unlike Karpen, Castle had been working as a nurse practitioner rather than a staff nurse, and she also had experience in management and the intensive care unit.

### 9. *Vacancy No. 2018-53*

Karpen next applied for Vacancy No. 2018-53, a nurse specialist position in the quality, safety, and value section responsible for reviewing medical records and other data and analyzing patient safety and related issues. Barker was the selecting official. Certain candidates were interviewed, although Karpen was not. Barker selected Rhoda Rancap, a woman of Asian descent in her mid-50s. Rancap was skilled at medical record review (an important part of the job), and Barker assessed that she had a strong clinical

background. Rancap had been serving as the "off shift" director of nursing for Lake Forest Hospital on weekends, holidays, and her days off.

### 10.    *Vacancy No. 2018-60*

Lastly, Karpen applied for Vacancy No. 2018-60, a diabetes nurse practitioner position. The selecting official for the position was Dr. Jeffrey Ryan, a white man in his early 40s who was the chief of medicine at the Jesse Brown VA. Karpen was interviewed along with other applicants, including the selectee, Geraldine Holt, a Black woman in her mid-60s. In Dr. Ryan's view, Holt's "skill set and experience matched perfectly to our need." (Def. SOF ¶ 75.) Holt had been performing the same role for more than 20 years outside the VA and had started the diabetic program at Stroger Hospital.

### F.    **EEO and Court Proceedings**

Based on the events discussed above, Karpen initiated eight EEO administrative proceedings. These administrative proceedings found no race or age discrimination or retaliation on the part of the VA. Karpen subsequently filed this lawsuit about two years ago in October 2021. Her Amended Complaint alleges that the VA subjected her to race and age discrimination and retaliation by failing to promote her or select her for various roles. Karpen also purports to assert a hostile work environment claim based on the same events.

In addition to the job vacancies discussed above, the Amended Complaint also alleges discrimination and retaliation in connection with her non-selection for Vacancy Nos. 2014-18 (a nurse educator position), 2014-26 (a utilization nurse manager position), 2015-21 (a veteran's health education coordinator position), and 2015-51 (a community

health nursing position). Karpen did not exhaust her administrative remedies with respect to any of these four non-selections prior to filing suit.

## II.   LEGAL STANDARD

Summary Judgment is proper only "if the admissible evidence considered, as a whole, shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Turner v. Wexford Health Sources, Inc.*, 2018 WL 3301818, at * 2 (S.D. Ill. July 5, 2018) (citing *Dynegy Mktg. & Trade v. Multuit Corp.*, 648 F.3d 506, 517 (7th Cir. 2011); FED. R. CIV. P. 56(c). The party seeking summary judgment bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If factual disputes exist after reviewing all evidence in the light most favorable to the nonmoving party, "these disputes preclude summary judgment." *Brown v. DS Servs. of Am., Inc.*, 246 F.Supp. 3d 1206, 1219 (N.D. Ill. 2017). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable inferences must be drawn in favor of the nonmoving party. *Id.* at 252, 255; *see also Srail v. Village of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009).

## III.   ANALYSIS

To prove a claim for race discrimination under Title VII or age discrimination under the ADEA, Karpen must demonstrate that the evidence, considered as a whole, would permit a reasonable factfinder to conclude that her race or age caused an adverse employment action. *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir.

2016); *see Carson v. Lake Cnty.*, 865 F.3d 526, 532–33 (7th Cir. 2017) (applying *Ortiz* to ADEA claims). Before *Ortiz*, courts distinguished between "direct" and "indirect" methods of analyzing discrimination claims. *Paterakos v. City of Chicago*, 2024 WL 1614991, at *10 (N.D. Ill. Mar. 11, 2024) (citing *Ortiz*, 834 F.3d at 763–64). *Ortiz* eliminated this distinction and directed courts to ask "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . or other proscribed factor caused the . . . adverse employment action." *Id.*

But even after *Ortiz*, the *McDonnell Douglas* burden-shifting framework is useful for analyzing discrimination claims. *Id.* (quoting *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("[B]oth before and after *Ortiz*, *McDonnell Douglas* is a means of organizing, presenting, and assessing circumstantial evidence ... in discrimination cases.")). To establish a *prima facie* case under the *McDonnell Douglas* framework, Karpen must show that: (1) she belongs to a protected class, (2) her job performance met the VA's legitimate expectations, (3) she suffered an adverse employment action, and (4) other similarly situated individuals, who were not members of the protected class, received more favorable treatment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014). If the plaintiff establishes a prima facie case, the burden toggles to defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action. *David*, 846 F.3d at 225. If established, the burden then shifts back to plaintiff, who must demonstrate these reasons are pretextual. *Id.*

Although "the protections of Title VII are not limited to members of historically discriminated-against groups," *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 821 (7th Cir. 2006) (citation omitted), the Seventh Circuit has modified the "protected class" prong to establish a *prima facie* case in reverse discrimination cases, *e.g.*, a race discrimination claim brought by a white plaintiff, to require proof of "background circumstances [that] show an inference that the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something 'fishy' about the facts at hand," *Bless v. Cook Cnty. Sheriff's Office*, 9 F.4th 565, 574 (7th Cir. 2021) (citation omitted). This may include evidence "that members of one race were fired and replaced by members of another race," that "employers are under pressure from affirmative action plans, customers, public opinion, the EEOC, a judicial decree, or corporate superiors imbued with belief in 'diversity,'" or of a "gross disparity in qualifications" may supply the required "background circumstances." *Paterakos*, 2024 WL 1614991, at *10.

As explained below, Karpen has failed to adduce evidence of racial and age discrimination or retaliation that would be sufficient to support a reasonable jury verdict in her favor, so the Court grants the Defendant's Motion for Summary Judgment.

### A. Unexhausted Claims

As a threshold matter, Karpen failed to exhaust her administrative remedies with respect to any non-selection claims relating to Vacancy Nos. 2014-18, 2014-26, 2015-21, and 20151. "Federal government employees may bring Title VII and ADEA employment discrimination claims in federal court only after they have timely exhausted their administrative remedies." *Hambrick v. Kijakazi*, 79 F.4th 835, 841 (7th Cir. 2023) (quoting

*Formella v. Brennan*, 817 F.3d 503, 510 (7th Cir. 2016)) (emphasis added). To satisfy this exhaustion requirement, a federal employee must "obtain EEO counseling or file an informal complaint within 45 days of the alleged discriminatory action." *Formella*, 817 F.3d at 510 (citing 29 C.F.R. § 1614.105(a)(1)). The allegations "brought before the administrative agency limit[] the scope of subsequent civil proceedings in federal court." *Reynolds v. Tangherlini*, 737 F.3d 1093, 1099 (7th Cir. 2013).

Karpen concedes in her reply brief that she did not administratively exhaust non-selection claims relating to these four vacancies at all, let alone timely report them to an EEO counselor within 45 days (it is obviously years too late to exhaust any such claims now). (Def. SOMF ¶¶ 77-79; Pl. SOF at 23). Instead, Karpen included her non-selection for these vacancies in the Freedom of Information Act ("FOIA") request she submitted as supporting evidence of her claims of ongoing and discriminatory non-selection. (Pl. SOF at 23). While Karpen may rely on these unexhausted non-selections for purposes of a hostile work environment claim, her failure to exhaust means that she may not rely on them as discrete acts of discrimination or retaliation. *See Hambrick*, 79 F.4th at 841-42 (in contrast to a hostile work environment claim, "claims alleging discrete acts of discrimination must be timely raised during administrative proceedings"). Accordingly, to the extent Karpen intends to rely on them as discrete acts of discrimination or retaliation, the court GRANTS Summary Judgment to the VA for Vacancies No. 2014-18, 2014-26, 2015-21, and 20151.

## B.      Discrimination

Karpen fails to establish a prima facie case for race and age discrimination (nor retaliation) because there is no evidence her age or race infected the hiring process for any vacancy. Karpen's theory essentially hinges on two instances. The first is a meeting with Karpen, her colleague Sheneill Fitzpatrick with whom Karpen shared a toxic working relationship, and their supervisor Jacqueline Thebaud. Karpen argues that she was discriminated against because she "was the only employee Thebaud ever reprimanded for alleged 'rude' conduct. In comparison, Thebaud did nothing to address Fitzpatrick's public, unsubstantiated allegations against Karpen for being a 'racist' and 'bigot.'" (Dkt. No. 37 at 8). Hence, she argues, that "[t]he more favorable treatment Karpen's Black managers demonstrated toward another Black employee establish a sufficient inference of discriminatory motive to render summary judgment premature." (*Id.*) To bolster this "direct evidence of animus and circumstantial evidence of disparate treatment," Karpen notes that 11 selectees were Black whereas only 3 were white, with the implication that the statistical overrepresentation of Black selectees constitutes something "fishy" about the merits of the selection process.

The second instance is an elevator scene where Mary Toles (Black woman), the VA's deputy associate director responsible for approving selectees for vacancies, allegedly remarked once that she did not like white people so much so that she "didn't like to even wipe up white milk." (Dkt. No. 37-3; PX1 at 21:8-10). This elevator scene is hearsay: an out-of-court statement used to prove the matter asserted that Toles had the racial animus against white employees to infect the decision-making. Thus, the milk statement is

inadmissible. But even if this plainly inappropriate workplace statement were admissible, "[o]ffhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) (quoting *Passananti v. Cook Cty.*, 689 F.3d 655, 667 (7th Cir. 2012)); *see Hambrick*, 79 F.4th at 843 ("insults, personal animosity, and juvenile behavior are insufficient evidence of a hostile work environment unless they are so pervasive or severe as to interfere with an employee's work performance.") (cleaned up).

Even still, Karpen fails to evidence discrimination because none of these individuals (Thebaud, Toles, Fitzpatrick) were involved in the hiring process. While Mary Toles did approve the contract for the employee selected by the hiring committee and selecting official, her approval was limited to reviewing the contract's compliance with the Union and ensuring the selectee met the job's criteria. In other words, Toles's role did not become activated until *after* interviews and selection, and Karpen concedes that she was neither interviewed nor selected by the selecting officials and committee for each vacancy – not Thebaud, Toles, or Fitzpatrick.

The lack of evidentiary support for racial or age animus is underscored by the fact that three of the selected individuals and seven of the selecting officials were white, and many were Karpen's age or older. Supposing all of the selecting officials were not white, Karpen's claim would still fail because she has not articulated how Toles, Thebaud, or Fitzpatrick might have conspired with the sprawling cast of other vacancy selectors (which involved more than two dozen racially and age diverse individuals, including VA

employees with no direct or indirect association to Karpen's colleagues and supervisors) to ensure that Karpen, because of her race or age, was not selected.

Moreover, as Defendant notes, Karpen does not and cannot identify any truly similarly situated employees who were treated more favorably. Similarly situated employees must be "'directly comparable in all material respects.'" *Rucker v. Ill. Dep't of Children & Family Servs.*, 326 Fed. Appx. 397, 399 (7th Cir. 2009) (quoting *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2014)). For instance, in *Widmar v. Sun Chemical Corporation*, the plaintiff's claim did not survive summary judgment even though the plaintiff's supervisor falsely and negatively characterized plaintiff's work performance because his duties, which were relegated, were given to two men younger and "significantly older." 772 F.3d 457, 467 (7th Cir. 2014). Karpen has made an identical showing of similarity as the *Widmar* plaintiff-employee, as Karpen shares characteristics as other older and white employees that were selected for the vacancies Karpen alleges she discriminated for. *Id.* at 467 ("it is still true that Widmar's duties were re-delegated among two men who were significantly older than Widmar, and two men who were significantly younger.")

The only comparator of favorable treatment that Karpen offers is Thebaud's failure to reprimand Fitzpatrick at the meeting with Toles discussed above. But as in *Widmar,* this disparate treatment–that is, a lack of reciprocal reprimanding– "could arise just as easily if [Thebaud] simply did not like [Karpen's] personality or his style or, for that matter, his cologne." *Id.* at 462. It is also possible that Thebaud and others genuinely but unfairly believed that Karpen was racist. However, Title VII "does not protect

employees from poor managers or unpleasant and unfair employers." *Id*. It simply protects employees from racial and age discrimination, and addressing perceived racist conduct is not discrimination – it is at best unfair and at worst necessary.

While Karpen identifies Black or younger employees who were selected for the positions she applied for, the undisputed facts show that those individuals had different backgrounds and experience levels and were ultimately more qualified for the positions than Karpen, precluding them from serving as viable comparators. Def. SOMF ¶¶ 44, 46, 49-50, 53, 56, 59, 63, 65-66, 70, 72, 75; *see Rucker*, 326 Fed. Appx. at 399. Karpen disputes the selectees' qualifications, but "cases of purely subjective preference for one position over another" do not satisfy Title VII's materially adverse criterion. *Arteaga v. Brennan*, 2019 WL 6497953, at *6 (E.D. Wis. Dec. 3, 2019). And as in *Widmar,* employees at Jesse Brown VA that shared Karpen's racial and age (or even older) characteristics were selected for vacancies repeatedly. "Consequently, [Karpen] has not made a showing that such [selection] was a pretext for discrimination." *Id*.; *see Vega v. Chicago Park Dist.*, 165 F.Supp. 3d 693 (7th Cir. 2016) (finding pretext where identical conduct resulted in 20 to 42 days of surveillance and firings or suspensions for non-white employees but one or two weeks of surveillance and no adverse employment action for white employees).

Karpen attempts to dispute the reasons why she was deemed less qualified for the vacancies by challenging the admissibility of the evidence on which Defendant's Motion for Summary Judgment relies. Defendant's Motion cites to various written affidavits submitted to the EEOC during its investigations into Karpen's claims, wherein hiring

managers detail the hiring process of each vacancy Karpen claims she was discriminated for being white and for being over 40 years old. While these affidavits are indeed out-of-court statements, they are not being to prove the matter asserted, and are consequently not hearsay. *See also Cairel v. Alderden*, 821 F.3d 823 (7th Cir. 2016) ("to be considered on summary judgment, evidence must be admissible at trial, though '*the form produced at summary judgment need not be admissible.*'") (quoting *Wragg v. Village of Thornton*, 604 F.3d 464, 466 (7th Cir.2010)). For instance, Baker's assessment that Karpen received the lowest score for Vacancy No. 2016-32 is not offered to prove that Karpen was in fact the least qualified; it is offered as a legitimate, nondiscriminatory reason for why Karpen was not selected for the given vacancy. The same is true of Dr. Ryan's impression that Holt was better fit the Vacancy No. 2018-16 than Karpen.

That there are "significant demographic imbalances" among statistics as compared to the broader nation does not raise an inference that a defendant's provided reasons are pretext, as Karpen argues. Rather, a claimant "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the defendant's proffered reasons that a reasonable person could find them unworthy of credence and hence infer that the defendant did not act for the asserted non-discriminatory reasons." *Widmar*, 772 F.3d at 465. Karpen makes no such identification, and the record consistently shows that Karpen was selected for reasons related to competency and fit, not race and not age.

Karpen appears to misunderstand the nature of documents when she argues that Defendant's facts are unsupported by "any" documentation. (*See generally* Dkt. No. 37). Setting aside the affidavits (which are documents themselves), Defendant submits

photocopies of various business records, such as their internal and external job listings and the VA's hiring manual, as well as depositions and Karpen's previous complaints to the EEOC (i.e., documents) to substantiate their factual claims. This evidence is clearly admissible. Thus, Karpen is unable to manufacture a material dispute of fact based on admissibility.

As evident in the above analysis, there is essentially little discussion of age discrimination in Karpen's complaint besides conclusory restatements of Karpen's cause of action. Because Karpen has failed to adduce any evidence of race or age discrimination, the Court GRANTS Summary Judgment in favor of Defendant.

### C.    Hostile Workplace

Lastly, the Court GRANTS Summary Judgment to the VA on Karpen's hostile work environment claim. To survive summary judgment on such a claim, a plaintiff must show that her work environment was objectively and subjectively offensive due to "severe or pervasive" conduct, and that "the harassment was based on membership in a protected class." 2 *Jones v. Dep't of Children & Family Servs.*, 2018 WL 5776331, at *6 (N.D. Ill. Nov. 2, 2018). Karpen cannot make any of these showings.

Karpen's theory appears to be that, taken together, her non-promotions and non-selections (again, by an array of selectors) constituted a hostile work environment. (DX71, Pl. Answers to Interrogatories, No. 6) But while Karpen may have been subjectively offended by not being chosen, her allegations at most describe the types of "normal workplace friction" that simply do not rise to the level of actionable harassment. *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004) (complaints about "transfers,

- 22 -

a late overtime payment, [the plaintiff's] salary, and difficulties with managers" did not establish the requisite "workplace trauma"); *see also Hambrick*, 79 F.4th at 843 (finding that "[n]early all" of the plaintiff's complaints related to "everyday work disagreements"). Even if Karpen did have evidence of objectively offensive conduct that was severe or pervasive (which she does not), nothing in the record would link it to her race, age, or EEO activity. *See Jones*, 2018 WL 5776331, at *7 (granting summary judgment for this reason).

### IV.    CONCLUSION

For the reasons herein, the Court GRANTS Defendant's Motion for Summary Judgment (Dkt. No. 34).

**IT IS SO ORDERED.**

_____
        Harry D. Leinenweber, Judge
        United States District Court

Dated: 5/13/2024